COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
 2-06-325-CV

 

 

TEXAS BAY CHERRY HILL, L.P.                                             APPELLANT

 

                                                   V.

 

THE CITY OF FORT WORTH, TEXAS,                                      APPELLEES

AND
BECKY L. HASKIN

 

                                              ------------

 

           FROM
THE 153RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I.                   
Introduction








Texas Bay Cherry Hill, L.P. (ACherry Hill@)
appeals from a trial court order granting the City of Fort Worth=s plea to the jurisdiction and
dismissing Cherry Hill=s
claims against former Fort Worth City council member Becky L. Haskin.  This appeal presents four key questions:  (1) whether the City was engaged in a
governmental functionCand
therefore immune from suitCor
a proprietary functionCand
therefore subject to suitCwhen
it allegedly committed the acts made the basis of Cherry Hill=s claims for business disparagement,
tortious interference, and civil conspiracy; (2) whether Cherry Hill=s claims for a declaratory judgment and
injunctive relief were ripe for determination; (3) whether Cherry Hill stated a
claim for inverse condemnation; and (4) whether Haskin was entitled to
dismissal of Cherry Hill=s
claims against her under section 101.106 of the civil practice and remedies
code.  We affirm.

II.                
Background

Cherry Hill owns the Cherry Hill apartment complex
in the Woodhaven neighborhood on the east side of Fort Worth.  Woodhaven primarily comprises relatively
low-income multifamily apartment complexes, but it also contains a smaller
enclave of higher-income single-family homes. 

A.                
The Woodhaven
redevelopment plan

In 2003, a consulting group prepared a report for
the City council recommending the Adispersion
of low-income housing units throughout the city.@  After endorsing the recommendation, the City=s Housing and Workforce Development
Committee asked City staff to bring forward a project to demonstrate the dispersal
and deconcentration of low-income housing. 
The City selected Woodhaven for the demonstration based on the high
concentration of assisted housing and Section 8 units in the neighborhood.  








The City council hired a consultant, Gideon Toal,
to create a Woodhaven master development plan (Athe
Plan@).  The City council also created a steering
committee of Woodhaven community volunteers and City officials, including
council member Becky Haskin, whose district included Woodhaven.  Haskin is also a Woodhaven resident.

The Plan sought to abate high crime rates, reverse
declining property values, and achieve a balance of incomes and housing types
in Woodhaven.  To that end, it
recommended the redevelopment of a key Woodhaven intersectionCBoca Raton Boulevard and Oakland Hills
DriveCas a Aneighborhood center@ to spur redevelopment in the
area.  The recommended redevelopment
called for the acquisition of two commercial properties and five apartment
complexes. 

Cherry Hill is one of the apartment
complexes.  Cherry Hill and the other
four apartment complexes in question had unusually high police calls and
reported crimesC33% of
all police calls to Woodhaven and 30% of all Part I and II crimes.[1]  In 2004, providing police and emergency
services to the apartment complexes cost the City $4.4 million, while tax
revenue from all of Woodhaven was only $0.6 million. 








The Plan identified a $13-$15 million Ainvestment gap@
as an obstacle to redevelopment; in other words, the cost of acquisition and
redevelopment of the property in question was higher than the redevelopment=s expected revenue or sales price,
making it extremely unlikely that a private developer would undertake the
project.  The Plan suggested a
public-private partnership to bridge the investment gap and identified several
possible financing tools, including implementing tax increment financing,
capturing incremental sales and property taxes from site-specific development,
borrowing funds from community development block grants, and creating a local
development corporation.  








Gideon Toal presented a draft of the Plan to the
City council on June 28, 2005.  On February
14, 2006, after several public hearings and a report from the City manager, the
City council passed a resolution endorsing the plan.  The Plan, the City manager=s report to the City council regarding
the Plan, and the resolution adopting the plan all explicitly state that the
City will not use its powers of eminent domain to acquire property under the
Plan.  The City manager recommended that
the City encourage the project through economic development incentives, and the
City council authorized City staff to Anegotiate
a public-private partnership for implementation of the goals outlined in the
Plan by means of the City=s
available economic community development incentive tools, as City staff deems
appropriate and feasible, including but not limited to, tax abatement and
increment financing.@


B.                
The City=s suit against Cherry Hill

Meanwhile, in September and October 2004, the City
sued Cherry Hill to abate common and public nuisances under chapter 125 of the
civil practice and remedies code,[2]
alleging that Cherry Hill=s
apartment complex was a common nuisance under section 125.0015.[3]  In January 2005, Cherry Hill and the City
signed a rule 11 settlement agreement in which they agreed to abate the lawsuit
and cooperate with one another to reduce criminal activity at the Cherry Hill
apartments.  The City also agreed to
dismiss its lawsuit after a year if Cherry Hill fulfilled its end of the bargain,
and the City eventually dismissed the lawsuit. 

C.                
Cherry Hill=s suit against the City 








In September 2005, Cherry Hill filed this suit
against the City, Haskin, and Woodhaven Community Development, Inc., alleging
they conspired to diminish the apartment complex=s
value by disparaging it and tortiously interfered with its business
relationships with existing and prospective tenants.  Cherry Hill alleged that the City=s chapter 125 suit was a sham intended
to justify the defendants=
statements that the apartments would soon close and be demolished and that the
defendants affirmatively steered prospective residents away from the
apartments, including Hurricane Katrina refugees.  Cherry Hill also sought a declaratory
judgment and injunctive relief to stop the City from using its eminent domain
powers for economic development. 

The City filed an original answer, a plea to the
jurisdiction, and a motion to dismiss Cherry Hill=s
claims against Haskin.  Cherry Hill
amended its pleading by adding an inverse condemnation claim, a request for a
declaration that the Plan is unlawful urban renewal under local government code
sections 374.001-.910, and a request to enjoin the City from continuing to
fund and participate in the Plan. 

After a hearing, the trial court granted the City=s plea to the jurisdiction and motion
to dismiss Haskin.  Cherry Hill nonsuited
its claims against Woodhaven Community Development, Inc. and filed this appeal.

III.              
The City=s Plea to the Jurisdiction








The City=s
plea to the jurisdiction asserted two key reasons why the trial court lacked
jurisdiction over Cherry Hill=s
claims:  (1) the City is immune from suit
for the alleged actions made the basis of Cherry Hill=s
business defamation, tortious interference, and conspiracy claims and (2) Cherry
Hill=s
declaratory judgment action and request for injunctive relief are not ripe for
determination. 

A.                
Standard of
review

A plea to the jurisdiction challenges the trial
court=s
authority to determine the subject matter of the action.  Tex. Dep=t
of Transp. v. Jones, 8 S.W.3d 636, 638 (Tex. 1999).  Whether a trial court has subject matter
jurisdiction and whether pleadings allege facts that affirmatively demonstrate
the trial court=s subject
matter jurisdiction are questions of law that we review de novo.  Tex. Dep=t
of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004); Tex.
Natural Res. Conservation Comm=n
v. IT‑Davy, 74 S.W.3d 849, 855 (Tex. 2002). 








The determination of whether a trial court has
subject matter jurisdiction begins with the pleadings.  Miranda, 133 S.W.3d at 226.    The plaintiff has the burden to plead facts
affirmatively showing that the trial court has jurisdiction.  Tex. Ass=n
of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993); Univ. of
N. Tex. v. Harvey, 124 S.W.3d 216, 220 (Tex. App.CFort
Worth 2003, pet. denied). We construe the pleadings liberally in favor
of the pleader, look to the pleader=s
intent, and accept as true the factual allegations in the pleadings.  See Miranda, 133 S.W.3d at 226, 228; City
of Fort Worth v. Crockett, 142 S.W.3d 550, 552 (Tex. App.CFort Worth 2004, pet. denied) (op. on
reh=g).

If a plea to the jurisdiction challenges the
existence of jurisdictional facts, we consider relevant evidence submitted by
the parties when necessary to resolve the jurisdictional issues raised, as the
trial court is required to do.  See
Bland ISD v. Blue, 34 S.W.3d 547, 555 (Tex. 2000) (confining the
evidentiary review to evidence that is relevant to the jurisdictional
issue).  We take as true all evidence
favorable to the nonmovant and indulge every reasonable inference and resolve
any doubts in the nonmovant=s
favor.  Miranda, 133 S.W.3d at
228.  If the evidence creates a
fact question regarding the jurisdictional issue, then the trial court cannot
grant the plea to the jurisdiction, and the fact question will be resolved by
the fact-finder.  Id. at 227B28; Bland, 34 S.W.3d at
555.  If the relevant evidence is
undisputed or fails to raise a fact question on the jurisdictional issue,
however, the trial court rules on the plea to the jurisdiction as a matter of
law.  Miranda, 133 S.W.3d at 227B28; Bland, 34 S.W.3d at 555.

B.                
Governmental
immunity








The doctrine of governmental
immunity prohibits suits against a governmental entity unless there has been a
clear and unambiguous constitutional or statutory waiver of that immunity.  Dallas County MHMR v. Bossley, 968 S.W.2d
339, 341 (Tex.), cert. denied, 525 U.S. 1017 (1998).  This immunity from suit defeats a trial court=s subject matter jurisdiction, which is never presumed.  Jones, 8 S.W.3d at 638B39; Tex. Air Control Bd., 852 S.W.2d at 443B44.  The legislature granted a
limited waiver of immunity in the Texas Tort Claims Act, which permits suits to
be brought against governmental units in certain narrowly-defined
circumstances.  Tex. Dep=t of Criminal Justice v. Miller, 51 S.W.3d
583, 587 (Tex. 2001); see also Dallas County MHMR, 968 S.W.2d at 341.

1.                 
Governmental functions versus proprietary
functions

A municipality is a governmental entity entitled
to sovereign immunity, but only for some of its functions.  A municipal corporation exercises two kinds
of functions, proprietary functions and governmental functions.  Tooke v. City of Mexia, 197 S.W.3d
325, 343 (Tex. 2006).  Generally
speaking, a municipality=s
proprietary functions are those conducted in its private capacity, for the
benefit only of those within its corporate limits, and not as an arm of the
government.  Id.  In contrast, governmental functions concern
purely governmental matters solely for the public benefit.  Id.








Section 101.0215 of the Tort Claims Act contains a
nonexclusive list of thirty-six functions the Legislature specifically
identified as governmental and three identified as proprietary.  Tex.
Civ. Prac. & Rem. Code Ann. ' 101.0215(a) (Vernon 2005).[4]  If a function is included in this
nonexclusive list of governmental functions, the Legislature has deemed it
governmental in nature, and we have no discretion or authority to hold
otherwise.  Ethio Express Shuttle
Serv., Inc. v. City of Houston, 164 S.W.3d 751, 756 (Tex. App.CHouston [14th Dist.] 2005, no pet.); Tex. River Barges v. City of
San Antonio, 21 S.W.3d 347, 357 (Tex. App.CSan Antonio 2000, pet. denied).








A municipality is liable for
torts arising from the exercise of its proprietary functions, but it is
generally immune from suit and liability for torts arising from the exercise of
its governmental functions, except for the limited waiver provided by the Texas
Tort Claims Act.  Tex. Civ. Prac. & Rem. Code Ann. ' 101.0215(a), (b) (AA municipality is liable under this chapter for damages arising from
its governmental functions . . . . 
This chapter does not apply to the liability of a municipality for
damages arising from its proprietary functions . . . .@).  The proprietary‑governmental
dichotomy has been used to determine a municipality=s immunity from suit for tortious conduct.  Tooke, 197 S.W.3d  at 343.

Determining a municipality=s immunity from suit is a two‑step inquiry.  Ethio Express Shuttle Serv., Inc., 164
S.W.3d at 754 n.4.  First we determine
whether the function is governmental or proprietary.  Id.; Dalon v. City of DeSoto,
852 S.W.2d 530, 536 (Tex. App.CDallas 1992, writ denied); McKinney v. City of Gainesville, 814
S.W.2d 862, 865 (Tex. App.CFort Worth 1991, no writ).  If
it is governmental, the second step is to determine whether immunity is waived
under the Texas Tort Claims Act.  Ethio
Express Shuttle Serv., Inc., 164 S.W.3d at 754 n.4; Dalon, 852
S.W.2d at 536; McKinney, 814 S.W.2d at 865.








When determining whether an
action is proprietary or governmental, it is contrary to the intent of the Tort
Claims Act for the court to focus exclusively on the municipality=s conduct without first considering the context within which the
conduct occurred.  Inman v. City of
Katy, 900 S.W.2d 871, 873 (Tex. App.CCorpus Christi 1995, no writ) (holding city entitled to governmental
immunity for allegedly slanderous statements regarding former police officer
made by assistant police chief in the context of a police investigation).

2.                 
The City=s
adoption of the Plan is a governmental function.

Before turning to the specific conduct Cherry Hill
alleged as the basis of its tort claims, we first consider the context in which
the conduct occurred.  See id.  The context in which the conduct occurredCand the backdrop for all of Cherry Hill=s claimsCis
the Plan.  Thus, a threshold question is
whether the City=s
adoption of the Plan is a governmental or a proprietary function.

The Plan arguably falls
within four of the thirty-six governmental functions enumerated in the Tort
Claims Act: police and fire protection and control; building codes and
inspections; zoning, planning, and plat approval; and community development or
urban renewal activities undertaken by municipalities and authorized by local
government code chapters 373 and 374.  Tex. Civ. Prac. & Rem. Code Ann. ' 101.0215(a)(1), (28)-(29), (34). 
The City argues that adoption of the Plan was an exercise of its
planning function under section 101.0215(a)(29) We agree.








APlanning@ connotes a systematic development contrived to serve the common
interest and contemplates the evolvement of an overall program or design of the
present and future development of the total area and services of the
municipality.  101A C.J.S. Zoning
& Land Planning ' 2(b)
(1979).  The Plan fits neatly into this
definition; it laid out a program for the future redevelopment of the Woodhaven
area for the common interest.  Because
the City=s adoption of the Plan was an exercise of its planning power, the
adoption of the Plan was a governmental function.








In addition, community
development under local government code section 373 closely matches the Plan
and its stated objectives.  The
Legislature enacted chapter 373 for the express purposes of eliminating slums
and areas affected by blight, reducing the geographic isolation of income
groups, and alleviating physical and economic distress through the stimulation
of private investment and community revitalization in slum or blighted areas,
among other things.  Tex. Loc. Gov=t Code Ann. ' 373.002(b)(1), (8)-(9) (Vernon 2005).  Chapter 373 authorizes a municipality to
adopt a community development program to aid in the prevention or elimination
of slums and blighted areas.  Id. ' ' 373.004(3), 373.005(a) (Vernon 2005). 
A community development program may include the demolition of buildings
and improvements, including financing of private acquisition of those
properties; construction or reconstruction of public works; and the
rehabilitation of privately-owned properties. 
Id. ' 373.005(b).  Chapter 373
authorizes a variety of programs by which a municipality may provide financing
for the redevelopment of privately-owned property or to assist private,
for-profit entities to carry out an economic development project.  Id. ' 373.005(c), (d).  But the chapter does not grant a municipality
the power of condemnation to rehabilitate or remove buildings or to acquire
real property for the purpose of resale. 
Id. ' 373.007(a)
(Vernon 2005).  A municipality must
conduct public hearings on the proposed community development program before
adopting the program by resolution or ordinance.  Id. ' 373.006 (Vernon 2005).

The Plan calls for the
demolition of certain buildings, the construction or reconstruction of public
works, and the rehabilitation of privately-owned properties.  It contemplates the use of various financial
incentives and tools to finance the redevelopment of private property by
private entities.  It specifically
rejects the use of the City=s eminent domain powers to achieve the stated goals.  The City held public hearings on the Plan
before adopting it by resolution.  Thus,
the Plan is a community development plan under local government code chapter
373, and the City=s adoption
of the Plan was the exercise of a governmental function under civil practice
and remedies code section 101.0215(a)(34) as well.  See Tex.
Civ. Prac. & Rem. Code Ann. ' 101.0215(a)(34). 

 








3.                 
Business disparagement, tortious interference, and
conspiracy claims

 

Having considered the context in which the City=s alleged wrongful conduct occurred, we
turn now to the specific wrongful acts alleged by Cherry Hill, beginning with
the alleged intentional torts, (1) business disparagement, (2) tortious
interference with existing and prospective business relationships, and (3)
conspiracy between the defendants to commit business disparagement and tortious
interference.

With regard to the business disparagement claim,
Cherry Hill specifically alleged the following:

Defendants
Haskin . . . and City (by and through its employees or officials)
acting in furtherance of the Defendants=
collective or collaborative private and/or proprietary interests, have made
statements to the press and/or to the community that Plaintiff is an absentee
owner whose property is mismanaged, unsafe for habitation, crime-ridden or
otherwise not suitable as apartment dwellings [and] are going to be closed or
condemned . . . . 

 

Elsewhere in its petition, Cherry Hill made more specific
allegations:

Haskin
and Joe Epps, president of Defendant Development, Inc. have been front and
center in this effort.  Both appeared in
a news report aired by Fox-4 News on August 23, 2005 in which the public was
informed that Plaintiff=s
apartments, which they found to be offensive, would soon be demolished.  Haskin is quoted in the October 4, 2005 Fort
Worth Star Telegram stating that Plaintiff=s
properties are mismanaged.

 








. . .
[T]he City=s actual
and true agenda was publically revealed by Libby Watson, the City=s Assistant City Manager, who is quoted
in the October 5, 2005 edition of Fort Worth Weekly as saying that Athose three apartment complexes in
question were not operating in the manner that we want to have in our
community,@ and Awe are not going to place folks in an
apartment complex that we don=t
feel meets a minimal standard.@


 

With regard to its tortious interference claim,
Cherry Hill alleged that it Ahad
lease contracts subject to interference, or a reasonable probability of entering
into lease contractual relationships, with which one or more of the Defendants
willfully and intentionally interfered, and such interference proximately
caused actual damages or loss to Plaintiff.@  The specific acts of interference alleged by
Cherry Hill included the statements made the basis of its disparagement claim
and the City=s failure
to include the apartments on a list of housing available for Hurricane Katrina
refugees:

Defendants
have also affirmatively steered prospective residents of Plaintiff=s apartments away from the apartments,
including evacuees of the recent hurricane Katrina tragedy, whom the Plaintiff
invited to reside at its property on very attractive terms that would assist
them in rebuilding their lives.  In an
effort to ensure the ongoing vacancy of the apartments, the Defendant City
consciously elected to exclude Plaintiff=s
apartments from its list of available housing for Katrina evacuees. 

 

In its conspiracy claim, Cherry Hill alleged that
the defendants conspired to injure its business and diminish the value of its
property via business disparagement and tortious interference. 

 








a.                
Governmental or proprietary?

 

While Cherry Hill=s petition described the Plan at length, and it sought declaratory and
injunctive relief from the effects of the Plan, it did not specifically
reference the Plan in its business defamation, tortious interference, and
conspiracy claims.  Cherry Hill argues
that business defamation and tortious interference are proprietary functions
unrelated to the Plan and for which the City has no immunity.  The City responds that Cherry Hill=s artful pleading cannot avoid the fact that all of its claims arise
from the Plan and the exercise of the City=s governmental functions.

As we have already noted, the
Plan is the backdrop for all of Cherry Hill=s allegations and involved the exercise of a governmental
function.  But the specific statements
made the basis of Cherry Hill=s disparagement, interference, and conspiracy claims require
individual scrutiny to determine whether they, too, involve the exercise of
governmental functions.  Conduct is not
governmental merely because it touches upon a governmental function.  City of Corpus Christi v. Absolute Indus.,
120 S.W.3d 1, 4 (Tex. App.CCorpus Christi 2001, pet. ref=d) (holding that although garbage removal is a governmental function, city=s threat to retaliate against companies that sent their waste to a
private landfillCthereby
depriving the city of waste-removal revenueCmerely touched upon a governmental function).








First we consider the
statement allegedly made by Haskin and City employees that Cherry Hill=s apartments were mismanaged, unsafe for habitation, crime-ridden, not
suitable as apartment dwellings, and subject to closure or condemnation.  These alleged statements are directly and
closely related to the express reasons for and the goals of the Plan.  The alleged statements more than Atouch upon@ the Plan;
they are more like a summary of the Plan itself.  Because adoption of the Plan was an exercise
of a governmental  function, we hold that
these alleged statements were also made in the furtherance of a governmental
function.

Likewise, the statements
allegedly made by Haskin, Epps, and Watson that the apartments were mismanaged,
substandard, offensive, and subject to demolition are closely related to the
Plan=s goals and proposed means of achieving those goals.  Moreover, Watson=s alleged statement that the apartments were substandard falls within
another governmental function specifically enumerated by the Legislature,
building codes and inspections.  See Tex. Civ. Prac. & Rem. Code Ann. ' 101.0215(a)(28).  Thus, we
hold that these alleged statements were made in the furtherance of a
governmental function.








Finally, we consider the
allegation that the City steered Hurricane Katrina refugees away from Cherry
Hill=s apartments, thereby interfering with the prospective business
relationship between Cherry Hill and the refugees.  The Plan called for the acquisition and
demolition of the apartments but identified an investment gap that would
discourage private investors from buying and demolishing the apartments and
redeveloping the property for other uses. 
The City directed its staff to narrow the investment gap using the
economic tools available for community development.  For the City to refer refugeesCwho might become long-term City residentsCto an apartment complex designated for demolition under the Plan runs
contrary to the Plan=s goals and
would only serve to widen the investment gap. 
Thus, the City=s alleged
decision not to  refer refugees to the
apartments was closely related to Plan, and we hold that the decision was the
exercise of a governmental function.

b.                 
The City is immune from suit for Cherry Hill=s intentional tort allegations.

 








Having determined that the intentional torts
alleged by Cherry Hill involved the exercise of governmental functions, we must
proceed to the second step of the immunity analysis and determine whether
immunity is waived under the Tort Claims Act. 
See Ethio Express Shuttle Serv., Inc., 164 S.W.3d at 754 n.4; Dalon, 852 S.W.2d at 536; McKinney,
814 S.W.2d at 865.      When a municipality is engaged in a
governmental function, its immunity is not waived for claims merely because
they arise out of intentional torts.  Tex. Civ. Prac. & Rem. Code Ann. ' 101.057(2) (providing that
governmental immunity is not waived for intentional torts) (Vernon 2005);
Benefit Realty Group v. City of Carrolton, 141 S.W.3d 346, 349 (Tex. App.CDallas 2004, pet. denied).  The
Tort Claims Act permits suit against governmental units for personal injuries
or property damage in three general circumstances: personal injuries caused by
(1) the use of publicly owned automobiles, (2) a condition or use of tangible
personal or real property, and (3) a premises defect, or the condition of real
property.  See Tex. Civ. Prac. & Rem. Code Ann. '' 101.021(1)-(2) (Vernon 2005), 101.022 (Vernon Supp. 2007); Perez
v. City of Dallas, 180 S.W.3d 906, 910 (Tex. App.CDallas 2005, no pet.).

Cherry Hill pleaded none of
these waivers of immunity, and none appears to be applicable to its
allegations.  We therefore hold that the
City is immune from suit for Cherry Hill=s disparagement, interference, and conspiracy claims and that the
trial court did not err by granting the City=s plea to the jurisdiction on these claims.  We overrule Cherry Hill=s first issue to the extent that it concerns these claims.

C.                
Ripeness

Ripeness is an element of subject matter
jurisdiction.  Mayhew v. Town

of Sunnyvale, 964 S.W.2d 922, 928 (Tex. 1998), cert.
denied, 526 U.S. 1144








(1999).  A case is not ripe
when its resolution depends upon contingent or hypothetical facts or upon
events that have not yet come to pass.  Waco
ISD v. Gibson, 22 S.W.3d 849, 851 (Tex. 2000).  Ripeness, like other justiciability
doctrines, derives in part from the constitutional prohibition against advisory
opinions, which in turn stems from separation‑of‑powers principles.  Patterson v. Planned Parenthood of
Houston and Se. Tex., Inc., 971 S.W.2d 439, 442 (Tex. 1998).

In addition to restraining
courts from issuing unconstitutional advisory opinions, ripeness also has a
pragmatic, prudential aspect that aims to conserve judicial time and resources
for real and current controversies, rather than abstract, hypothetical, or
remote disputes.  Patterson, 971
S.W.2d at 443; Mayhew, 964 S.W.2d at 928.  These factual and prudential concerns
underlie the court=s
determination of ripeness, in which it considers (1) the fitness of the issues
for judicial decision and (2) the hardship occasioned to a party by the court=s denying judicial review. Perry v. Del Rio, 66 S.W.3d 239, 250
(Tex. 2001).

1.                 
Cherry Hill=s
declaratory judgment action is not ripe.








Declaratory judgment actions are subject to a
ripeness review. See Firemen=s
Ins. Co. of Newark, N.J. v. Burch, 442 S.W.2d 331, 333 (Tex. 1968) (holding
Declaratory Judgments Act does not empower courts to issue advisory
opinions).  Our sister courts have held
that a declaratory judgment action is premature if governmental proceedings
which will impact the parties=
respective rights remain pending.  In Save
Our Springs Alliance v. City of Austin, the court held that the trial court
lacked jurisdiction to grant a declaratory judgment that a development
agreement was invalid because no permit had yet been issued.  149 S.W.3d 674, 678 (Tex. App.CAustin 2004, no pet.).  In Texas A & M
University v. Hole, the Waco court held that a declaratory judgment action
concerning student disciplinary proceedings was not ripe because the students
had not yet completed the disciplinary process. 
194 S.W.3d 591, 593 (Tex. App.CWaco 2006, pet. denied); see also Tex. Ass=n of Bus., 852 S.W.2d at 444 (holding
the Declaratory Judgments Act does not enlarge the court=s jurisdiction but merely provides a procedural device for deciding
cases already within that jurisdiction).








In its first amended
petition, Cherry Hill sought six declarations. 
Five of the requested declarations expressly relate to the alleged illegality
and unconstitutionality of the City=s exercise of its eminent domain powers in connection with the
Plan.  The sixth declaration sought by
Cherry Hill indirectly referred to the City=s eminent domain power; Cherry Hill sought a declaration that the Plan
was illegal under local government code chapter 374 because the City failed to
hold an election to designate Woodhaven as a slum or blighted area, and chapter
374 authorizes the use of eminent domain to redevelop such areas.  See Tex.
Loc. Gov=t Code Ann. ' ' 374.011,
.016 (Vernon 2005).  Thus, all of the
declarations sought by Cherry Hill are related to the exercise of the City=s eminent domain power in connection with the Plan.

But the Plan expressly states
that the City will not use its eminent domain power in connection with the
Plan.  Moreover, the City council
resolution endorsing the Plan states that Athe City cannot exercise its powers of eminent domain for the purpose
of acquiring property for economic development purposes.@ 








Because the City has
expressly stated that it will not use its eminent domain power in connection
with the Plan, Cherry Hill=s request for a declaration regarding the use of eminent domain in
connection with the Plan is not ripe. 
The declaratory judgment action does not present a real and current
controversy; rather, it presents an abstract, hypothetical, and remote dispute.  See Patterson, 971 S.W.2d at 443; Mayhew,
964 S.W.2d at 928.  The declaratory
judgment claim is not fit for judicial review, and the trial court=s refusal to review it presents no hardship to Cherry Hill, which can
assert its declaratory judgment action if and when the City does attempt to
exercise its eminent domain power.  See
Perry, 66 S.W.3d at 239.  Because
Cherry Hill=s
declaratory judgment action is not ripe, the trial court lacked jurisdiction
over it.  See Mayhew, 964 S.W.2d
at 928.  We therefore hold that the trial
court did not err by granting the City=s plea to the jurisdiction with regard to Cherry Hill=s declaratory judgment action.

2.                 
Cherry Hill=s
request for an injunction is not ripe.

For the same reasons, the trial court did not err
by granting the City=s
plea to the jurisdiction with regard to Cherry Hill=s
request for injunctive relief.  A request
for injunctive relief is subject to a ripeness review.  See Tex. A & M Univ., 194 S.W.3d at 593 (vacating injunction for lack of ripeness).

Cherry Hill sought an
injunction prohibiting the City from participating in the Plan because the Plan
threatened Cherry Hill with eminent domain condemnation.  Because the City expressly stated that it
would not exercise its eminent domain power in connection with the Plan, Cherry
Hill=s request for injunctive relief is not ripe, and the trial court did
not err by dismissing this claim for want of jurisdiction.

Because the trial court
properly dismissed Cherry Hill=s claims for declaratory judgment and injunctive relief, we overrule
the remainder of its first issue.

D.                
Inverse
Condemnation








We turn now to Cherry Hill=s
inverse condemnation claim.  After the
City filed its plea to the jurisdiction, Cherry Hill amended its pleading and
alleged that the ACity has
acted in bad faith to damage Plaintiff=s
business and diminish the value of Plaintiff=s
property@ and that
such acts constituted a taking under article I, section 17 of the Texas
Constitution.  Cherry Hill identified Asteering prospective tenants
. . . away from Plaintiff=s
property@ as one
basis for its takings claim, but it is otherwise unclear whether the claim is
based on the Plan, the City=s
alleged tortious interference and business disparagement, or some combination
thereof.  Although the City=s plea to the jurisdiction did not
address the inverse condemnation claim, the trial court dismissed it along with
Cherry Hill=s other
claims without explanation.








Cherry Hill points out that
the City did not challenge the inverse condemnation claim in its plea to the
jurisdiction, but it does not explicitly argue that this is grounds for
reversal.  Even if we construe Cherry
Hill=s briefs as making this argument, it must fail because subject matter
jurisdiction can be raised at any time: ANot only may an issue of subject matter jurisdiction be raised
for the first time on appeal by the parties or by the court, a court is obliged
to ascertain that subject matter jurisdiction exists regardless of whether
the parties have questioned it.@  Univ. of Tex. Sw. Med. Ctr.
at Dallas v. Loutzenhiser, 140 S.W.3d 351, 358 (Tex. 2004); see Barto
Watson, Inc. v. City of Houston, 998 S.W.2d 637, 639 (Tex. App.CHouston [1st Dist.] 1999, pet. denied) (analyzing takings allegations
to determine subject matter jurisdiction even though plaintiff asserted takings
claim in amended pleading filed after the defendant city filed its plea to the
jurisdiction).

Cherry Hill argues that the
trial court erred by dismissing its inverse condemnation claim because a
governmental entity has no immunity from an inverse condemnation suit.  The City concedes that article I, section 17
generally waives its immunity from suit for such claims, but argues that the
waiver does not apply when a plaintiff does not allege a Avalid@ inverse
condemnation claim. 

The doctrine of governmental
immunity does not shield a governmental entity from an action for compensation
under the takings clause.  Gen. Servs.
Com=n v.
Little-Tex Insulation Co., Inc., 39 S.W.3d
591, 598 (Tex. 2001).  But when a
plaintiff fails to allege facts that constitute a taking, dismissal for want of
jurisdiction is appropriate.  See id.
at 600 (dismissing inverse condemnation claim for want of jurisdiction because
allegations did not state a takings claim). 
Whether alleged facts are enough to constitute a takings claim is a
question of law.  Id. at 598.  Thus, we must determine whether Cherry Hill=s allegations constitute a takings claim.








To establish a takings claim,
a plaintiff must prove (1) the governmental entity intentionally performed
certain acts, (2) that resulted in a Ataking@ of
property, (3) for public use.  Gen.
Servs. Com=n, 39 S.W.3d at 598.  A taking
can be either a physical taking or a regulatory taking.  Mayhew, 964 S.W.2d at 923.

A physical taking occurs when
the government physically authorizes an unwarranted physical occupation of the
property.  Id.  Cherry Hill did not allege a physical
occupation; thus, it has not alleged a physical taking.

A regulatory taking may
occur, in the absence of any physical invasion, by means of a governmental
restriction that constitutes an unreasonable interference with the use and
enjoyment of the property.  Taub v.
City of Deer Park, 882 S.W.2d 824, 826 (Tex. 1994), cert. denied,
513 U.S. 1112 (1995).  A regulation is a
taking if (1) it compels the owner to suffer a physical invasion of the owner=s property,  Sheffield Dev.
Co. v. City of Glenn Heights, 140 S.W.3d 660, 671 (Tex. 2004); (2) it
deprives the owner of all economically beneficial use of the property, Mayhew,
964 S.W.2d at 935; or (3) it imposes restrictions that unreasonably interfere
with the owner=s right to
use and enjoy the property, id. at 936B37.[5]








Assuming that the Plan is a Aregulation,@[6] Cherry Hill has not alleged facts that raise an issue under the first
two theories of regulatory taking.  The
Plan does not compel Cherry Hill to suffer a physical invasion of its property,
and Cherry Hill alleged that the City=s action Adamage[d]
Plaintiff=s business
and diminish[ed] the value of Plaintiff=s property,@ not that it
deprived Cherry Hill of all economically beneficial use of the property.

The third theory of
regulatory taking, also called the Penn Central analysis, is implicated
when there is not a complete taking, either physically or by regulation, but the
regulation goes Atoo far,@ causing an unreasonable interference with the landowner=s right to use and enjoy the property.  See Penn Cent. Transp. Co. v. New York,
438 U.S. 104, 124B25, 98 S.
Ct. 2646, 2659 (1978). There is no formulaic test for these ad hoc factual
inquiries.  Id.  at 124, 98 S. Ct. at 2659.  Nonetheless, factors to be considered include
(1) the economic impact of the regulation and (2) the extent to which the
regulation interferes with reasonable investment‑backed
expectations.  Id.; see also
Sheffield, 140 S.W.3d at 671B72.








Cherry Hill=s allegations raise issues with regard to neither Penn Central
factor.  Because of the Plan=s $13-$15 million Ainvestment gap@ between the
cost of acquiring and developing the property and its anticipated
postdevelopment value, no investor has come forward to join the City=s proposed Apublic-private
partnership@ and put the
Plan into action.  Thus, the Plan has had
no economic impact on Cherry Hill=s apartments; or at the very least, the extent of the Plan=s economic impact is impossible to discern at this time.  See Williamson County Reg=l Planning Com=n v. Hamilton Bank, 473 U.S. 172, 181, 105
S. Ct. 3108, 3119 (1985) (holding court lacked jurisdiction over regulatory
takings claim when it was impossible to discern what the economic impact of the
challenged regulation would be or the extent to which it would interfere with
the developer=s reasonable
investment‑backed expectations). 
Likewise, Cherry Hill has not alleged, and the pleadings and record do
not otherwise show, any reasonable investment-backed expectation on Cherry Hill=s part nor the Plan=s interference with same.

Stated another way, the Plan
currently exists only on paper, and unless and until the Plan is implemented,
Cherry Hill cannot allege facts that constitute a regulatory taking.  Therefore, dismissal for want of jurisdiction
is appropriate.  See Gen.
Servs. Com=n, 39 S.W.3d at 598.  We overrule
Cherry Hill=s second
issue.








IV.             
Dismissal of
Cherry Hill=s claims against Haskin

In its third and fourth issues, Cherry Hill argues
that the trial court erred by dismissing its claims against Haskin under
section 101.106 of the Tort Claims Act.

A.                
Section 101.106

After the Tort Claims Act was enacted, plaintiffs
often sought to avoid the Act=s
damages cap or other strictures by suing governmental employees, since claims
against them were not always subject to the Act.  Mission Consol. ISD v. Garcia, Nos. 05‑0734,
05‑0762, 05‑0763, C S.W.3d C, C, 2008 WL 821037, at *2 (Tex. Mar. 28, 2008).  To prevent such circumvention, and to protect
governmental employees, the Legislature created an election‑of‑remedies
provision.  Id.  As originally enacted, section 101.106,
entitled AEmployees
Not Liable After Settlement or Judgment,@ provided:

A
judgment in an action or a settlement of a claim under this chapter bars any
action involving the same subject matter by the claimant against the employee
of the governmental unit whose act or omission gave rise to the claim.

 








Act of May 17, 1985, 69th Leg., R.S., ch. 959, ' 1, 1985 Tex. Gen. Laws 3242, 3305 (current version at Tex. Civ. Prac. & Rem. Code ' 101.106). Employees were thus afforded some protection when
claims against the governmental unit were reduced to judgment or settled, but
there was nothing to prevent a plaintiff from pursuing alternative theories
against both the employee and the governmental unit through trial or other
final resolution.  Mission Consol. ISD,
2008 WL 821037, at *2.

In 2003, as part of a
comprehensive effort to reform the tort system, the Legislature amended section
101.106.  Id.  That section, entitled AElection of Remedies,@ now provides:

(a)
The filing of a suit under this chapter against a governmental unit constitutes
an irrevocable election by the plaintiff and immediately and forever bars any suit
or recovery by the plaintiff against any individual employee of the
governmental unit regarding the same subject matter.

 

(b)
The filing of a suit against any employee of a governmental unit constitutes an
irrevocable election by the plaintiff and immediately and forever bars any suit
or recovery by the plaintiff against the governmental unit regarding the same
subject matter unless the governmental unit consents.

 

(c)
The settlement of a claim arising under this chapter shall immediately and
forever bar the claimant from any suit against or recovery from any employee of
the same governmental unit regarding the same subject matter.

 

(d) A
judgment against an employee of a governmental unit shall immediately and
forever bar the party obtaining the judgment from any suit against or recovery
from the governmental unit.

 

(e)
If a suit is filed under this chapter against both a governmental unit and any
of its employees, the employees shall immediately be dismissed on the filing of
a motion by the governmental unit.

 








(f)
If a suit is filed against an employee of a governmental unit based on conduct
within the general scope of that employee=s employment and if it could
have been brought under this chapter against the governmental unit, the suit is
considered to be against the employee in the employee=s
official capacity only. On the employee=s motion, the suit against
the employee shall be dismissed unless the plaintiff files amended pleadings
dismissing the employee and naming the governmental unit as defendant on or
before the 30th day after the date the motion is filed.

 

Tex. Civ. Prac. &
Rem. Code Ann. ' 101.106.








The revision=s apparent purpose was to force a plaintiff to decide at the outset
whether an employee acted independently and is thus solely liable, or acted
within the general scope of his or her employment such that the governmental
unit is vicariously liable, thereby reducing the resources that the government
and its employees must use in defending redundant litigation and alternative
theories of recovery.  Mission Consol.
ISD, 2008 WL 821037, at *3; see also Waxahachie ISD v. Johnson, 181
S.W.3d 781, 785 (Tex. App.CWaco 2005, pet. denied) (op. on reh=g); Villasan v. O=Rourke, 166 S.W.3d 752, 758, 759B60 (Tex. App.CBeaumont
2005, pet. denied).  By requiring a
plaintiff to make an irrevocable election at the time suit is filed between
suing the governmental unit under the Tort Claims Act or proceeding against the
employee alone, section 101.106 narrows the issues for trial and reduces delay
and duplicative litigation costs.  Mission
Consol. ISD, 2008 WL 821037, at *3. 
The Act=s election
scheme is intended to protect governmental employees by favoring their early
dismissal when a claim regarding the same subject matter is also made against
the governmental employer.  Id.

B.                
Was Haskin a
City employee?

Cherry Hill first argues that Haskin, in her
capacity as City council member, was not a City employee.  AEmployee,@ as defined by the Tort Claims Act,
means a person, including an officer or agent, who is in the paid service of a
governmental unit by competent authority, but does not include an independent
contractor, an agent or employee of an independent contractor, or a person who
performs tasks the details of which the governmental unit does not have the
legal right to control. Tex.
Civ. Prac. & Rem. Code Ann. ' 101.001(2) (Vernon 2005). 
Cherry Hill contends that because the City does not have the legal right
to control the details of a council member=s tasks, a council member is not an employee.[7]  We disagree for three reasons.








First, the City presented
uncontroverted evidence that the City paid Haskin for her services as a City
council member.  Thus, Haskin was Ain the paid service of a governmental unit.@  See Tex. Civ. Prac. & Rem. Code Ann. ' 101.001(2).

Second,

[t]he
Act=s
definition of >employee= does
not require that a governmental unit control every detail of a person=s
work. The operator of a motor vehicle, for example, must exercise independent
judgment, but this does not mean that he or she cannot be considered an
employee under the Act. If it did, a governmental unit could never >be
liable for . . . injury . . . proximately caused by
. . . the negligence of an employee . . . aris[ing] from
the operation or use of a motor‑driven vehicle= even
though section 101.021(1) of the Act provides for such liability.

 

Murk v. Sheele, 120 S.W.3d 865, 867 (Tex. 2003) (rejecting argument that physician
was not government employee even though exercise of physician=s independent professional judgment was outside governmental unit=s right of control).  Thus, even
if the City did not have the legal right to control all of Haskin=s work as a council member, this factor does not exclude her from the
definition of Aemployee.@








Finally, Haskin=s status as an elected official does not place her outside the
definition of Aemployee.@   Section 101.001(2)=s precursor specifically included Aelective@ officials
in the definition of Aemployee,@[8] but Aelective@ and other qualifiers were omitted as superfluous from the definition
when article 6252-19 was recodified as chapter 101 of the civil practice and
remedies code:

In
the definition of Aemployee@ the
source material allowing the employment to be either Afull
or part‑time,@ Aelective
or appointive,@ and Asupervisory
or nonsupervisory@ is
omitted because the definition is not limited by any of those conditions. 

 

Tex. Civ. Prac. &
Rem. Code Ann. ' 101.001
revisor=s note
(emphasis added).  We therefore hold that
Haskin, in her capacity as a City council member, was a City employee as
defined by the Tort Claims Act.

C.                
Individual
versus official capacity and Aunder this chapter@

Cherry Hill next argues that the trial court erred
by dismissing its claims against Haskin because it sued her in her  individual capacity, not in her official
capacity as a City council member, and because it brought none of its claims
under the Tort Claims Act.  These
arguments fail because whether a plaintiff sues a governmental employee in the
employee=s
official or individual capacity is irrelevant under the applicable subsections
of section 101.106 and because all tort theories alleged against a governmental
unit are assumed to be claims under the Tort Claims Act for purposes of section
101.106.








In Mission Consol. ISD,
three terminated school district employees (collectively, AGarcia@) sued the
district and its superintendent for violations of the Texas Commission on Human
Rights Act and various common-law claims that do not fit within the Tort Claims
Act=s limited waiver of immunity, including claims for defamation, fraud,
and intentional infliction of emotional distress.  Id. at *1.  The school district filed a plea to the
jurisdiction, arguing that Garcia=s decision to sue both the district and the superintendent barred her
suit against the district under section 101.106(b).  Id.  The trial court denied the plea, and the
Corpus Christi court of appeals affirmed the denial.  Id.








Before addressing the school
district=s right to dismissal under 101.106(b), the supreme court considered
the effect subsection (e) would have on Garcia=s suit against the superintendent if it applied (the district did not
move to dismiss Garcia=s claims
against the superintendent under subsection (e)).  Id. at *4.  The supreme court rejected the court of
appeals=s conclusion that because Garcia=s claims did not fit within the Tort Claims Act waiver of immunity,
they were not brought Aunder this
chapter@ and that subsection (e) did not apply.  Id. 
The supreme court looked to earlier decisions interpreting the
former section 106.101.  Id.  In Newman v. Obersteller, the
court held that former section 101.106's limiting phrase Aunder this chapter@ operated to bar an intentional tort claim against an employee after a
final judgment on a claim involving the same subject matter had been rendered
against the governmental unit, even though the Act by its terms expressly
excluded intentional torts from the scope of the Act=s immunity waiver.  960 S.W.2d
621, 622B23 (Tex. 1997).  The court cited
several other cases reaching the same conclusion under the former section
101.106.  Mission Consol. ISD,
2008 WL 821037, at *3 (collecting cases). 
Although these cases construed the prior version of section 101.106,
there is nothing in the amended version that would indicate a narrower
application of the phrase Aunder this chapter@ was intended.  Id.  Because the Tort Claims Act is the only,
albeit limited, avenue for common‑law recovery against the government,
all tort theories alleged against a governmental unit, whether it is sued alone
or together with its employees, are assumed to be Aunder@ the Tort
Claims Act for purposes of section 101.106. 
Id. (citing Newman, 960 S.W.2d at 622).[9]








Therefore, in this case, we
must assume that all of Cherry Hill=s tort claims against the CityCwhich we have held arise from the exercise of the City=s governmental functionsCare claims Aunder@ the Tort Claims Act for purposes of section 101.106, despite the fact
that Cherry Hill did not invoke or refer to the Tort Claims Act in its
pleadings and despite the fact that its tort claims against the City resulted
in dismissal as a result of the City=s governmental immunity.  See
Newman, 960 S.W.2d at 622 (holding summary judgment in favor of school
district on basis of immunity rendered district=s employee immune from any further claims under former section
101.106).  Thus, subsection 101.106(e)
compels dismissal of Cherry Hill=s claims against HaskinCassuming the other requirements of section 101.106 are met.








Cherry Hill argues that
section 101.106(a) and (e)=s requirements are not met because it sued Haskin in her individual
capacity, not in her official capacity as a City employee.  A suit against a governmental employee in the
employee=s individual capacity seeks to impose personal liability on the
employee for actions taken under color of state law.  Hidalgo County v. Gonzalez, 128 S.W.3d
788, 793 (Tex. App.CCorpus
Christi 2004, no pet.).  A suit against
an employee in the employee=s official capacity seeks to impose liability on the governmental
entity itself.  Id.; De Miño v.
Sheridan, 176 S.W.3d 359, 365B66 (Tex. App.CHouston [1st
Dist.] 2004, no pet.).  To determine
whether the capacity in which Cherry Hill sued Haskin matters, we turn again to
the statute.  When construing a statute,
we must determine and give effect to the legislature=s intent, considering the statute as a whole and not its provisions in
isolation.  Continental Cas. Co. v.
Downs, 81 S.W.3d 803, 805 (Tex. 2002). 
Thus, we will examine the relevant provisions of section 101.106Csubsections (a) and (e)Cin the context of the entire statute.

Section 101.106(a) expressly
provides that A[t]he filing
of a suit under this chapter against a governmental unit constitutes an
irrevocable election by the plaintiff and immediately and forever bars any
suit or recovery by the plaintiff against any individual employee of
the governmental unit regarding the same subject matter.@  Tex. Civ. Prac. & Rem. Code Ann. ' 101.106(a) (emphasis added). 
Subsection (b) is the reciprocal of subsection (a) and provides that A[t]he filing of a suit against any employee of a governmental unit
constitutes an irrevocable election by the plaintiff and immediately and
forever bars any suit or recovery by the plaintiff against the governmental
unit regarding the same subject matter unless the governmental unit consents.@  Id. ' 101.106(b).  The
Legislature=s selective
inclusion and omission of the phrase Aunder this chapter@ in the two subsections is significant.








In Waxahachie ISD, the
Waco court held that the omission of the phrase Aunder this chapter@ in subsection (b) means that the subsection applies to suits against
an employee in both the employee=s official capacity individual capacity.  181 S.W.3d at 785.  AThe governmental unit is protected under both situations@; i.e., subsection (b) bars same-subject-matter suits against the
government regardless of the capacity in which the plaintiff sued the
employee.  Id.

Subsection (a) also includes
the phrase Aunder this
chapter@Cbut the phrase modifies only Asuit . . . against a governmental unit.@  Tex. Civ. Prac. & Rem. Code Ann. ' 101.106(a).  It does not modify Asuit . . . against any individual employee.@  Id.  Moreover, the words Aany suit@ in subsection (a)Cgiven their plain meaningCmean that any same-subject-matter suit against the employee is
barredCregardless of the capacity in which the plaintiff sues the
employee.  The Legislature=s inclusion of the modifier Aindividual@ before the
word Aemployee@ in
subsection (a) but not elsewhere in section 101.106 reinforces this conclusion;
read in context, it can only refer to the employee=s individual liability.  Thus,
under subsection (a), a Tort Claims Act suit against a governmental unit bars a
same-subject-matter suit against an employee of the governmental unit in both
the employee=s official
and individual capacities.  See id.

In other words, a suit under
the Tort Claims Act against a governmental unit bars a same-subject-matter suit
against an employee in both the employee=s official and individual capacities. 
We therefore hold that Cherry Hill=s assertion that it sued Haskin only in her individual capacity does
not bar dismissal under subsection (e).








D.              
Same subject
matter     

The sole remaining question
is whether Cherry Hill=s claims
against the City and its claims against Haskin are Aregarding the same subject matter.@  See id. ' 101.106(a).  Cherry Hill asserts the same tort claims
against the City and Haskin arising from the same alleged facts.  It further alleges that they conspired to
commit the torts in question and seeks to hold them jointly and severally
liable for its alleged damages.  We
therefore hold that Cherry Hill=s claims against the City and its claims against Haskin regard the
same subject matter.

In summary, Haskin is a City
employee under the Tort Claims Act. 
Under section 101.106(a), Cherry Hill=s claims against the City bar any suit against Haskin regarding the
same subject matter, regardless of whether Cherry Hill sued Haskin in her
official or individual capacity.  See
id.  Haskin was entitled to dismissal
of the claims against her upon filing of the City=s motion to dismiss.  See
Mission Consol. ISD, 2008 WL 821037, at *5. 
We therefore hold that the trial court did not err by granting the
motion to dismiss, and we overrule Cherry Hill=s third and fourth issues.

 

 

 








V.                
Conclusion

Having overruled all of Cherry Hill=s issues, we affirm the trial court=s judgment.

 

ANNE GARDNER

JUSTICE

 

PANEL B:   DAUPHINOT, GARDNER, and WALKER, JJ.

 

DAUPHINOT, J., dissents without opinion.

 

DELIVERED:  May 29, 2008











[1]Part
I and II crimes include homicide, rape, aggravated assault, burglary, and
vehicle theft. 





[2]See Tex. Civ. Prac. & Rem. Code Ann. '' 125.001-.002,
.004, .044-.045, .061 (Vernon Supp. 2007); .003, .042-.043, .046-.047,
.062-.069 (Vernon 2005).





[3]See id.
' 125.0015(b)
(AA
person maintains a common nuisance if the person maintains a multiunit
residential property to which persons habitually go to commit [various criminal
acts listed in subsection (a)] and knowingly tolerates the acts and furthermore
fails to make reasonable attempts to abate the acts.@).





[4]Section
101.0215(a) provides that the following functions are governmental: (1) police
and fire protection and control; (2) health and sanitation services; (3) street
construction and design; (4) bridge construction and maintenance and street
maintenance; (5) cemeteries and cemetery care; (6) garbage and solid waste
removal, collection, and disposal; (7) establishment and maintenance of jails;
(8) hospitals; (9) sanitary and storm sewers; (10) airports; (11) waterworks;
(12) repair garages; (13) parks and zoos; (14) museums; (15) libraries and
library maintenance; (16) civic, convention centers, or coliseums; (17)
community, neighborhood, or senior citizen centers; (18) operation of emergency
ambulance service; (19) dams and reservoirs; (20) warning signals; (21)
regulation of traffic; (22) transportation systems; (23) recreational
facilities, including but not limited to swimming pools, beaches, and marinas;
(24) vehicle and motor driven equipment maintenance; (25) parking facilities;
(26) tax collection; (27) fireworks displays; (28) building codes and
inspection; (29) zoning, planning, and plat approval; (30) engineering
functions; (31) maintenance of traffic signals, signs, and hazards; (32) water
and sewer service; (33) animal control; (34) community development or urban
renewal activities undertaken by municipalities and authorized by local
government code chapters 373 and 374; (35) latchkey programs conducted
exclusively on a school campus; and (36) enforcement of land use restrictions.  Id.





[5]The
United States Supreme Court recently rejected a fourth theory of  regulatory taking, namely, takings arising
from regulations that do not substantially advance legitimate state interests.  Lingle v. Chevron U.S.A., Inc., 544
U.S. 528, 541B45,
125 S. Ct. 2074, 2077B78
(2005).  The Texas supreme court has not
addressed whether the substantial advancement test remains valid for purposes
of Texas Constitutional law in light of Lingle.  In any event, Cherry Hill has not claimed
that the Plan does not advance legitimate state interests.





[6]The
other acts alleged by Cherry HillCbusiness disparagement and
tortious interferenceCare
not Aregulations@ and
thus cannot serve as the basis of a regulatory takings claim.





[7]We
find no Texas cases squarely addressing the question of whether a city council
member is an employee of the city under the Tort Claims Act.  We did not reach the question in Sanders
v. City of Grapevine, 218 S.W.3d 772, 777 (Tex. App.CFort
Worth 2007, pet. denied) (dismissing for want of jurisdiction interlocutory
appeal from dismissal of city council members under section 101.106(e)).  The Amarillo court declined to answer the
question in Hohstadt v. Madden, No. 07‑99‑00326‑CV,
2000 WL 513756, at *4 (Tex. App.CAmarillo Apr. 24, 2000, no
pet.) (not designated for publication). 





[8]Act
of May 14, 1969, 61st Leg., R.S., ch. 292, 1969 Tex. Gen. Laws 874, 875, repealed
by Act of May 17, 1985, 69th Leg., R.S., ch. 959, 1985 Tex. Gen. Laws
3242, 3322.





[9]A
different panel of this court reached a different conclusion when interpreting
section 101.106(e) in Meroney v. City of Colleyville, 200 S.W.3d 707,
714B15
(Tex. App.CFort
Worth 2006, pet. granted, judgment vacated and remanded by agreement)
(declining to apply Newman=s
holding to new section 101.106(a) and (e) and holding that subsection (a) did
not bar claims against governmental employee in his personal capacity).  The supreme court vacated this court=s
judgment in Meroney by agreement of the parties, and our opinion in that
case conflicts with, and was therefore overruled by, the supreme court=s
subsequent interpretation of section 101.106 in Mission Consolidated
ISD.  See Mission Consol. ISD, 2008
WL 821037, at *3B5.  Therefore, Meroney is not binding
precedent.